No. 14-3428

_____

# In the United States Court of Appeals for the Eighth Circuit

_____

John Frederick Dryer, et al.,

*Plaintiffs-Appellants*,

v.

National Football League,

*Defendant-Appellee*.

_____

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
Civ. No. 09-02182 (PAM/FLN), Hon. Paul A. Magnuson

_____

BRIEF OF AMICI CURIAE LAW PROFESSORS IN SUPPORT OF
DEFENDANT-APPELLEE NATIONAL FOOTBALL LEAGUE

_____

Rebecca Tushnet
Professor of Law
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
(703) 593-6759
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................. 1

ARGUMENT ........................................................................................... 2

I.   The films are Noncommercial Speech. ................................................. 2

II.  The Right of Publicity Cannot Constitutionally Be Extended to the
Films. .................................................................................................... 6

   A.  The Films Are Not False or Defamatory. ......................................... 6

   B.  *Zacchini* Provides No Warrant for Extending the Right of Publicity
   to the NFL's Films. ............................................................................ 9

   C.  Categorical Protection for Noncommercial Speech Against Right of
   Publicity Claims is Superior to the Alternatives. ................................ 12

III.   Separately, Copyright Preemption Precludes the Right of Publicity
Claim. ................................................................................................... 14

IV.   *Rogers* Properly Bars Appellants' Lanham Act Claims. ................. 23

CONCLUSION ....................................................................................... 25

i

Appellate Case: 14-3428     Page: 2     Date Filed: 03/17/2015 Entry ID: 4255390

# TABLE OF AUTHORITIES

## Cases

*Baltimore Orioles, Inc. v. Major League Baseball Players Association*, 805 F.2d 663 (7th Cir. 1986) .......................................................................... 18

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ......................... 3, 5

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) ........ 15

*Brown v. Electronic Arts*, 724 F.3d 1235 (9th Cir. 2013) ..................... 23, 24

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball*, 505 F.3d 818 (8th Cir. 2007) ........................................................................................... 7, 8, 11

*Campbell v. Acuff-Rose*, 510 U.S. 569 (1994) ................................................. 6

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797 (Cal. 2001) ... 10, 13

*Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964) ............... 15

*Doe v. TCI Cablevision*, 110 S.W.3d 363 (Mo. 2003) ................................ 13

*Dryer v. National Football League*, __ F. Supp. 3d __, 2014 WL 5106738 (D. Minn. 2014) ................................................................................. 11, 18

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008) ........................................................................................... 23

*ETW Corp. v. Jireh Pub'g, Inc.*, 332 F.3d 915 (6th Cir. 2003) ............. 13, 23

*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008) ………………6

*Fleet v. CBS, Inc.*, 58 Cal. Rptr. 2d 645 (Cal. Ct. App. 1996) .................... 20

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ................................. 15

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) ........................... 7, 16

*Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014) ................. 5

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) .................................... 3

ii

*Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146 (9th Cir. 2010)..................................................................................... 20

*Keller v. Elec. Arts (In re NCAA Student–Athlete Name & Likeness Licensing Litig.)*, 724 F.3d 1268 (9th Cir. 2013) ...................................... 24

*Lapham v. Porach*, 2007 WL 1224924 (S.D.N.Y. Apr. 25, 2007) .............. 17

*Laws v. Sony Music Entm't*, 448 F.3d 1134 (9th Cir. 2006) ................. 19, 22

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172 (S.D.N.Y. 2012) ....................................................................... 23

*Maloney v. T3Media, Inc.*, No. 14-cv-05048 (C.D. Cal. Mar. 6, 2015),...... 20

*Matthews v. Wozencraft*, 15 F.3d 432 (5th Cir. 1994) ................................... 5

*Milo & Gabby, LLC v. Amazon.com, Inc.*, No. C13-1932, 2014 WL 1411849 (W.D. Wash. 2014)................................................................... 20

*Montgomery v. Montgomery*, 60 S.W.3d 524 (Ky. 2001) ........................... 24

*Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975 (9th Cir. 2011)... 21

*Moore v. Weinstein Co.*, 545 Fed.Appx. 405 (6th Cir. 2013)....................... 23

*National Basketball Assoc. v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997) 18

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003)............................ 23

*Ray v. ESPN, Inc.*, No. 13-1179-CV, 2014 WL 2766187 (W.D. Mo. Apr. 8, 2014)................................................................................... 21

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ........................... 23, 24, 25

*Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964) ........................ 15

*Silverman v. CBS Inc.*, 870 F.2d 40 (1989). .............................................. 24

*Toney v. L'Oreal USA, Inc.*, 406 F.3d 905 (7th Cir. 2005)......................... 21

*United States v. Stevens*, 559 U.S. 460 (2010) ...................................... 12, 13

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ............................ 3

Appellate Case: 14-3428     Page: 4     Date Filed: 03/17/2015 Entry ID: 4255390

*University of Alabama Board of Trustees v. New Life Art, Inc.*, 683 F.3d 1266 (11th Cir. 2012) ................................................................ 23

*Wendt v. Host Int'l, Inc.*, 197 F.3d 1284 (9th Cir. 1999) ............................ 14

*White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512 (9th Cir. 1993) ............. 14

*Winchester Mystery House, LLC v. Global Asylum*, 148 Cal. Rptr. 3d 412 (Ct. App. 2012) ........................................................................................ 23

*Winter v. DC Comics*, 69 P.3d 473 (Cal. 2003) ........................................... 14

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977).. passim

## Statutes

17 U.S.C. § 301 ...................................................................... 14, 17, 20, 22

Fed. R. App. P. 29(c)(5) ................................................................................. 1

## Other Authorities

Thomas F. Cotter & Irina Y. Dmitrieva, *Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis*, 33 COLUM. J.L. & ARTS 165 (2010) ......................................................................... 18

Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn From Trademark Law*, 58 STAN. L. REV. 1161 (2006) ............................. 10

Christine Dolen, *Disney Acts Up*, MIAMI HERALD, Oct. 18, 1998 ................ 4

Wendy J. Gordon, *An Inquiry into the Merits of Copyright: The Challenges of Consistency, Consent and Encouragement Theory*, 41 STAN. L. REV. 1343 (1989) ............................................................................................. 10

2 MCCARTHY, RIGHTS OF PUBLICITY AND PRIVACY § 11:55 (2d ed. 2014)  10, 21

Appellate Case: 14-3428     Page: 5     Date Filed: 03/17/2015 Entry ID: 4255390

NFL R<small>ECORD</small> & F<small>ACT</small> B<small>OOK</small> 2014 ................................................................ 3

Melville B. Nimmer, *The Right to Speak from Times to Time: First Amendment Theory Applied to Libel and Misapplied to Privacy*, 56 C<small>AL</small>. L. R<small>EV</small>. 935, 942-43 (1968) ........................................................... 9

1 M<small>ELVILLE</small> B. N<small>IMMER</small> & D<small>AVID</small> N<small>IMMER</small>, N<small>IMMER ON</small> C<small>OPYRIGHT</small> § 1.01[B][3][b][iv][l] (rev. ed. 2013) ........................................................... 19

Jennifer E. Rothman, *Copyright Preemption and the Right of Publicity*, 36 U.C. D<small>AVIS</small> L. R<small>EV</small>. 199 (2002) ................................................................ 17

Daniel Jacob Wright, *Explicitly Explicit: The* Rogers *Test and the Ninth Circuit*, 21 J. I<small>NTELL</small>. P<small>ROP</small>. L. 193, 203 (2013) ........................................ 24

Graham Taylor, *A Footnote - Far from It: Publishers Are Key in Advancing Scholarship*, T<small>IMES</small> H<small>IGHER</small> E<small>D</small>. S<small>UPP</small>., Oct. 13, 2011 ............................... 4

Rebecca Tushnet, *A Mask that Eats into the Face: Images and the Right of Publicity*, 38 C<small>OLUM</small>. J.L. & A<small>RTS</small> 157 (2015) .......................................... 13

Sharon Waxman, *BET to Make Feature Films*, W<small>ASH</small>. P<small>OST</small>, Nov. 13, 1998 4

Diane Leenheer Zimmerman, *Who Put the Right in the Right of Publicity?*, 9 D<small>E</small>P<small>AUL</small>-LCA J. A<small>RT</small>. & E<small>NT</small>. L. 35 (1998) ............................................... 10

Appellate Case: 14-3428    Page: 6    Date Filed: 03/17/2015 Entry ID: 4255390

## INTEREST OF AMICI CURIAE

Amici are professors of law who research, write, and teach in the area of copyright, trademark, the right of publicity, and related fields. Amici's institutional affiliations are provided for identification purposes only, and imply no endorsement of the views expressed herein:

Stacy L. Dogan, Boston University School of Law

Eric Goldman, Santa Clara University School of Law

Laura A. Heymann, William & Mary Law School

Mark A. Lemley, Stanford Law School

Yvette Joy Liebesman, St. Louis University School of Law

Bill McGeveran, University of Minnesota School of Law

Mark P. McKenna, Notre Dame Law School

Tyler Ochoa, Santa Clara University School of Law

Rebecca Tushnet, Georgetown Law

Amici have no personal stake in the outcome of this case.[1] Counsel for all parties have consented to the filing of this brief.

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), *amici* hereby certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than *amici* contributed money intended to fund preparing or submitting the brief.

Appellate Case: 14-3428     Page: 7     Date Filed: 03/17/2015 Entry ID: 4255390

## SUMMARY OF ARGUMENT

Based on the undisputed facts, the NFL's films in this case are noncommercial speech; their profit-seeking and brand-building nature are standard features of noncommercial speech. Truthful, nondefamatory noncommercial speech deserves full First Amendment protection, and there is no justification for allowing Appellants to control speech about them in this case.

Separately, Appellants' right of publicity claims are preempted by the Copyright Act, which allows owners of copyrighted works to exploit those works by reproduction, distribution, creation of derivative works, and public performance—precisely the conduct at issue here.

Finally, Appellants' trademark claims are also precluded by the First Amendment, given that their appearance in the films at issue is relevant to the films' subject matter and not explicitly misleading as to any possible endorsement.

## ARGUMENT

### I. The Films Are Noncommercial Speech.

The District Court correctly ruled, as a matter of law, that the NFL

2

films at issue are noncommercial speech. *See United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (defining "commercial speech" as "speech that does no more than propose a commercial transaction"). The fact that the films have a commercial purpose doesn't change their constitutional status. The New York Times has a commercial purpose; so do video games, television programs, and films. *See, e.g., Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952) (holding that "expression by means of motion pictures is included within the free speech and free press guaranty" in the Constitution, even though filmmaking "is a large-scale business conducted for private profit").[2] The court's discounting of commercial purpose was not factfinding. It was adherence to constitutional command.

Nor does the NFL's explicit acknowledgment that its content contributes value to the NFL brand make its speech commercial. The NFL also publishes traditional books, such as *NFL Record & Fact Book 2014*.[3] Readers' ability to collect and review information about NFL teams

---

[2] *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562 (1977), labeled a television station's speech as commercial because it was made for profit, 433 U.S. at 575–76, but subsequent cases clarified that non-advertising speech made for profit is noncommercial for First Amendment purposes. *See, e.g.*, *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983) (holding that economic motivation for speech by itself does not make speech commercial).
[3] Retailing for $17.06 as of Jan. 25, 2015, http://www.amazon.com/Record-Official-National-FootballLeague/dp/1618933949.

Appellate Case: 14-3428     Page: 9     Date Filed: 03/17/2015 Entry ID: 4255390

undoubtedly increases attention to and affection for those teams, just as the film *Seabiscuit* brought more attention to a particular racehorse. But the books themselves are classic noncommercial speech: they are the content being sold, not ads for other products. So too with the NFL's films. The audiences for these works are likely to be football fans, but that's also true of the sports pages, broadcasts of NFL games, and biographies of Knute Rockne. All of these are plainly noncommercial speech.

Noncommercial speakers routinely enhance their "brands" through the creation of attractive content that is itself noncommercial speech.[4] Politicians write books promoting themselves and their connections to other well-known figures such as Ronald Reagan. The fact that the books are overwhelmingly positive and aid in fundraising doesn't make them commercial. "J.K. Rowling" is a registered trademark, U.S. Reg. No. 4,356,096, not to mention an incredible selling point for any book bearing her name. That selling power doesn't make *Harry Potter* commercial

---

[4] *See, e.g.*, Sharon Waxman, *BET to Make Feature Films*, WASH. POST, Nov. 13, 1998 ("The benefits for BET, even in a business as uncertain as movie production, is in accumulating a film library, creating movies for use on the three BET cable channels, and enhancing the company's brand name ...."); Graham Taylor, *A Footnote - Far from It: Publishers Are Key in Advancing Scholarship*, TIMES HIGHER ED. SUPP., Oct. 13, 2011, at 28 (touting the importance of academic journal "brands"); Christine Dolen, *Disney Acts Up*, MIAMI HERALD, Oct. 18, 1998, at 1I (statement from Disney executive that Lion King musical enhanced Disney's brand).

Appellate Case: 14-3428    Page: 10    Date Filed: 03/17/2015 Entry ID: 4255390

speech. Nor does the fact that sales of candy based on the *Harry Potter* series, Bertie Botts Every Flavor Beans, were driven by the success of *Harry Potter* make *Harry Potter* commercial speech. In short, a creator's recognition that an attractive presentation of its content enhances the creator's goodwill is completely standard for noncommercial speech.

As the court below recognized, it is also significant that individual consumers, advertisers and television channels pay for the NFL's content, rather than the NFL paying them to run it or sending it for free. This is strong evidence of the noncommercial nature of the NFL's films. Slip op. at 14-15. Unlike the image advertising in *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014), the NFL films themselves have economic value to the NFL *and to the films' distributors and audiences*, independent of some other product that could be separately purchased. *Cf. Matthews v. Wozencraft*, 15 F.3d 432, 440 (5th Cir. 1994) (finding that defendant's novel fell "within the protection of the First Amendment" whether it was "viewed as an historical or fictional work," so long as it was "not simply a disguised commercial advertisement for the sale of goods or services"). No particular commercial message about what else to buy is "easily inferred" from the films, *Jordan*, 743 F.3d at 519; *cf. Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) (finding pamphlets commercial where the manufacturer's

Appellate Case: 14-3428     Page: 11     Date Filed: 03/17/2015 Entry ID: 4255390

economic interest in disseminating them would only be served if consumers separately purchased contraceptives).[5]

The District Court's holding that the films were not advertisements in disguise also serves the important function of avoiding chilling effects on noncommercial speech that would inevitably result from mistakenly equating economic motivation with commerciality. *Cf. Campbell v. Acuff-Rose*, 510 U.S. 569, 584 (1994) (noting that "news reporting, comment, criticism, teaching, scholarship, and research ... 'are generally conducted for profit in this country'") (citations omitted).

## II. The Right of Publicity Cannot Constitutionally Be Extended to the Films.

Under ordinary First Amendment principles, the noncommercial NFL films cannot be restrained unless they are false or defamatory or fit within the narrow rule of *Zacchini*, which approved a right of publicity equivalent to infringement of common-law copyright. Neither justification exists here.

### A. The Films Are Not False or Defamatory.

This Court has recognized "the public value of information about the

---

[5] While amici believe that *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008), was wrongly decided, it may also be distinguished because no independent third party paid for the valuable rights to own a copy of or distribute the work in and of itself, as the program at issue there aired on the NFL Network.

Appellate Case: 14-3428     Page: 12     Date Filed: 03/17/2015 Entry ID: 4255390

game of baseball and its players." *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball*, 505 F.3d 818, 823 (8th Cir. 2007). Given the NFL's enormous popularity, information about professional football and its players has at least as much value. When an organization "lawfully obtains truthful information about a matter of public significance[,] then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103 (1979) *also* (emphasizing). Given the First Amendment value of truthful, nondefamatory speech, courts should not lightly give the subjects of such speech control over it. Thus, the right of publicity must be carefully limited to avoid becoming a right to control public discourse. *Cf. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) (refusing to allow the tort of intentional infliction of emotional distress to evade the strict requirements of defamation as applied to editorial speech).

In *C.B.C.*, this Court held that the First Amendment interests of fantasy baseball game providers trumped professional baseball players' rights of publicity. *C.B.C.,* 505 F.3d at 823.[6] Despite the fact that C.B.C.'s

---

[6] As *C.B.C.* recognized, and as *Zacchini* made clear, the question of whether the First Amendment trumps the plaintiff's right of publicity is a question of federal Constitutional law, not one of state law. *See Zacchini*, 433 U.S. at 568; *C.B.C.*, 505 F.3d at 822-24 (distinguishing between the state law

7

fantasy games were "for purposes of profit" and therefore "for commercial advantage," use of the players "names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data of each player" was clearly expressive. *Id.* No more is required of truthful noncommercial speech.

Amici believe that categorically distinguishing between commercial and noncommercial uses is generally the best way to implement *C.B.C.*'s balancing approach. Truthful noncommercial speech warrants the highest protection, while celebrities' economic interests in controlling truthful nonadvertising speech about them are much weaker than their interests in controlling advertising that invokes their identities to sell separate products. *See id.* at 824 (reasoning that celebrities can protect their economic interests by controlling sponsorships and blocking confusing commercial uses, and that any noneconomic interests in controlling truthful reporting about their performances do not justify suppressing truthful speech). As the *C.B.C.* court reasoned, "the information used in [the NFL's films] is all readily available in the public domain, and it would be strange law that a person would not have a first amendment right to use information that is available

---

question of whether the defendant's use was for commercial advantage and the question of whether the First Amendment trumps the right of publicity).

8

to everyone." *Id.* at 823.[7]  An approach that focuses on the commercial endorsement/noncommercial speech divide in striking the First Amendment balance avoids the chilling effects that would occur if the producer of truthful noncommercial speech had to anticipate a court's judgment about the value of its particular speech or of a particular person's personality rights, and comports with the categorically lower protection given to commercial speech.[8]

## B. *Zacchini* Provides No Warrant for Extending the Right of Publicity to the NFL's Films.

While *Zacchini* allows a "right of publicity" lawsuit in the context of noncommercial speech, it depends on circumstances not applicable here. The Supreme Court consistently characterized the conflict in *Zacchini* as one between the First Amendment and the use by the defendant of the plaintiff's "entire act"—equivalent to a common-law copyright, not a conventional right of publicity claim. *Zacchini*, 433 U.S. at 575.[9]

---

[7] Amici believe that *C.B.C.*'s reference to "the public domain" is best understood as a reference to the *C.B.C.* plaintiffs' attempts to claim facts as their own property outside the context of false endorsement.

[8] *See, e.g.*, Melville B. Nimmer, *The Right to Speak from Times to Time: First Amendment Theory Applied to Libel and Misapplied to Privacy*, 56 CAL. L. REV. 935, 942-43 (1968) (explaining the benefits of categorical balancing).

[9] *See Zacchini*, 433 U.S. at 573 ("the State's interest [in permitting a right of publicity] is closely analogous to the goals of patent and copyright law"); *id.*

9

The Court suggested that use of Zacchini's entire act posed a "substantial threat to the economic value of that performance." *Id*. But this concern was quite specific to broadcasting of the *entire* performance. Indeed, the Court emphasized that "the broadcast of [Zacchini's] entire performance, unlike the unauthorized use of another's name for purposes of trade or the incidental use of a name or picture by the press, goes to the heart of petitioner's ability to earn a living as an entertainer." *Id*. at 576. Thus, according to the Court, "Ohio ha[d] recognized what may [have been] the strongest case for a 'right of publicity'—involving, not the appropriation of an entertainer's reputation to enhance the attractiveness of a commercial product, but the very activity by which the entertainer acquired his

---

at 575 ("The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright owner."); *id*. at 576 ("the same consideration underlies the patent and copyright laws long enforced by this Court"); 2 J. THOMAS MCCARTHY, THE RIGHTS OF PUBLICITY AND PRIVACY § 11:55 ("The proper category for Zacchini's claim was the state law of common law copyright, not the right of publicity."); Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn From Trademark Law*, 58 STAN. L. REV. 1161, 1187 (2006) (same); Wendy J. Gordon, *An Inquiry into the Merits of Copyright: The Challenges of Consistency, Consent and Encouragement Theory*, 41 STAN. L. REV. 1343, 1365 n.97 (1989) (same); Diane Leenheer Zimmerman, *Who Put the Right in the Right of Publicity?*, 9 DEPAUL-LCA J. ART. & ENT. L. 35, 49-50 & n.43 (1998) (same); *cf. Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 806 (Cal. 2001) ("*Zacchini* was not an ordinary right of publicity case: the defendant television station had appropriated the plaintiff's entire act, a species of common law copyright violation.").

Appellate Case: 14-3428     Page: 16     Date Filed: 03/17/2015 Entry ID: 4255390

reputation in the first place." *Id*.

This case does not involve anything like use of the Appellants' "entire acts," and it does not involve a performance in which Appellants could have a common-law copyright. The films at issue collectively show only a fraction of the plays in which Appellants were involved as players, and Appellants appear in only small portions of the films. As the District Court found, even in the film that features the most footage of any Appellant (Dryer),

> his name is not mentioned until more than 5 minutes into the film and is spoken only twice in the entire production. The only way a viewer would know that Dryer appears in the footage is if the viewer knows that Dryer wore number 89 for the Giants. He is not featured in the production .… Most of his appearances in the production are fleeting, for mere seconds at a time .… The production never focuses only on Dryer or his image; rather, he is always shown with his teammates in the context of a football play.

*Dryer*, __ F.Supp.3d __, 2014 WL 5106738 at *5 (D. Minn., Oct. 10, 2014). The other Appellants appear even less prominently.[10]

Appellants' passing appearances in NFL Films also pose nothing like the economic threat of broadcasting Zacchini's entire performance. Aside from the brevity of their appearances, Appellants were paid for their participation in the NFL games shown in the films. *Id*. at *10; *see also C.B.C.*, 505 F.3d at 824 (rejecting right of publicity claims by Major League

---

[10] *Dryer*, 2014 WL 510738 at *5-*6.

Appellate Case: 14-3428     Page: 17     Date Filed: 03/17/2015 Entry ID: 4255390

Baseball players and noting that the players "are rewarded, and handsomely, too, for their participation in games and can earn additional large sums from endorsements and sponsorship arrangements"). The films made by NFL Films had no negative impact on Appellants' incentives to develop their football skills – if anything, Appellants benefited from NFL Films' contribution to the popularity of the NFL.

### C. Categorical Protection for Noncommercial Speech Against Right of Publicity Claims is Superior to the Alternatives.

Because *Zacchini* does not apply, the NFL cannot be subject to liability for noncommercial speech about a matter of public interest that is not false or defamatory. No other balancing is necessary. This bright-line approach avoids the chilling effects, unpredictability, and risks of mistake otherwise caused by ad hoc balancing, which would require courts to weigh incommensurable and unmeasurable free speech interests against a plaintiff's inchoate interests in "controlling" his public presentation. *Cf. United States v. Stevens*, 559 U.S. 460, 470 (2010) ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our

12

Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.").[11]

Amici believe that categorical protection for truthful noncommercial speech is superior to alternate approaches that require courts to take on the role of art critics, judging where the "value" in a work comes from. *See Comedy III Prod., Inc. v. Gary Saderup, Inc.,* 21 P.3d 797 (Cal. 2001) (adopting "transformativeness" test); *Doe v. TCI Cablevision*, 110 S.W. 3d 363, 374 (Mo. 2003) (asking whether the "predominant purpose" of the use "is to make an expressive comment on or about a celebrity," or whether instead the use "predominantly exploits the commercial value of an individual's identity"). The transformativeness test is derived from copyright law, but, unlike in a copyright case, there is no specific prior work that might be examined in a right of publicity case to see if the defendant's use adds new meaning, message, or purpose. As a result, transformativeness, like the predominant purpose inquiry, inevitably degenerates into an ad hoc evaluation of the artistic merits of the defendant's use, with unpredictable

---

[11] *See also Stevens*, 559 U.S. at 479 ("Most of what we say to one another lacks 'religious, political, scientific, educational, journalistic, historical, or artistic value' (let alone serious value), but it is still sheltered from government regulation.").

Appellate Case: 14-3428     Page: 19     Date Filed: 03/17/2015 Entry ID: 4255390

and speech-chilling results.[12]  Under the proper approach, a nondefamatory docudrama would be protected by the First Amendment even if it was a workmanlike retelling of the plaintiff's story,[13] and even if the plaintiff had licensed other docudramas in the past.  This rule avoids discrimination based on the artistic merit of the speech or the person depicted, so long as the speech is noncommercial.

## III.  Separately, Copyright Preemption Precludes the Right of Publicity Claim.

The Court should recognize the serious copyright conflicts involved in extending publicity rights to noncommercial speech.  The right of publicity potentially conflicts with a copyright owner's right to exploit its copyright. *See, e.g.*, *White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1514 (9th Cir. 1993) (Kozinski, J., dissenting from denial of reh'g en banc); *Wendt v. Host Int'l, Inc.*, 197 F.3d 1284, 1286 (9th Cir. 1999) (Kozinski, J., dissenting

---

[12] *See* Rebecca Tushnet, *A Mask that Eats into the Face: Images and the Right of Publicity*, 38 COLUM. J.L. & ARTS 157, 170-78 (2015); *cf. ETW Corp. v. Jireh Pub'g, Inc.*, 332 F.3d 915 (6th Cir. 2003) (majority and dissent disagreed about value of what painter-defendant contributed to painting); *Winter v. DC Comics*, 69 P.3d 473 (Cal. 2003) (reversing court of appeals' finding of nontransformativeness).

[13] The transformative use test is constitutionally perverse in that it makes First Amendment protection afforded to a work inversely correlated with accuracy.  If the test were taken seriously, the works least likely to enjoy immunity would be biographies and documentary films – works at the First Amendment's core, where the relevance of the use is most obvious.

14

from denial of reh'g en banc). Conflict preemption occurs when a state law obstructs a federal statute's aims, and can operate in tandem with an explicit preemption provision such as 17 U.S.C. § 301. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 867 (2000).

Conflict preemption is often appropriate where state rights are asserted in the context of works that fall within the general scope of copyright or patent law, regardless of whether the material claimed would be copyrightable or patentable. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231–32 (1964) ("To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public."); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 237-38 (1964) (same).

As the Supreme Court explained, states can pursue consumer protection objectives, but they cannot seek to encourage production directly by granting monopoly rights over federally unprotected subject matter. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156–57 (1989); *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) (finding no conflict between state trade secret law and patent law where the

15

type of conduct targeted was substantially different, even if trade secret protection also had incentive effects). As *C.B.C.* indicates, to the extent that the right of publicity protects consumers from misleading commercial advertising, it poses no conflict with copyright law.  But equally, to the extent that a state's right of publicity exists to protect against false endorsement, it should be subject to the same First Amendment constraints as Lanham Act false endorsement claims.  *See infra* Part IV.  Moreover, to the extent that a state's right of publicity exists to protect dignitary interests, it should not be allowed to evade First Amendment constraints on dignity torts: primarily falsity and actual malice.  *See Hustler*, 485 U.S. at 50; *supra*, Part I.A.

The remaining justification offered for the right of publicity in the context of the exploitation of creative works depicting public events is fundamentally the same as that of the copyright law: to incentivize production of creative performances. *Zacchini*, 433 U.S. at 576 ("[T]he protection [afforded by a right to control broadcast of an entire act] provides an economic incentive for [the performer] to make the investment required to produce a performance of interest to the public. This same consideration underlies the patent and copyright laws."); *see also Laws*, 448 F.3d at 1145 (recognizing the similarity); *C.B.C.*, 505 F.3d at 824 (publicity rights are

16

intended "to provide incentives to encourage a person's productive activities and to protect consumers from misleading advertising"). The efficacy or lack thereof of this proposed incentive is irrelevant, because providing incentives of this sort is a power reserved to the federal government. In this way, the right of publicity differs from other, nonpreempted causes of action such as defamation and invasion of privacy.

Furthermore, the fact that the right of publicity approved in *Zacchini* was functionally a common-law copyright in a performance that was not fixed with the author's consent, *see supra* note 9 and accompanying text, has relevance both for the First Amendment analysis and for the preemption analysis. After *Zacchini*, Congress preempted common-law copyrights for fixed works. *See Lapham v. Porach*, 2007 WL 1224924 (S.D.N.Y. Apr. 25, 2007).[14]

Professor Jennifer Rothman has provided the most comprehensive examination of conflict preemption beyond § 301, and applying her analysis reveals that conflict preemption is appropriate here because Appellants

---

[14] *Zacchini* was decided in 1977, before the current Copyright Act became effective (Jan. 1, 1978). The 1976 Copyright Act, unlike its predecessors, protects expressive works as soon they are fixed in a tangible medium, not when they are published; state common-law copyright is preempted except insofar as it covers unfixed works. Zacchini's claim, founded on a live performance that wasn't fixed with his consent, would still be outside the scope of the modern Copyright Act, but fixed creative works are now the exclusive realm of federal copyright law.

Appellate Case: 14-3428    Page: 23    Date Filed: 03/17/2015 Entry ID: 4255390

consented to their appearance in copyrighted works. *See* Jennifer E.

Rothman, *Copyright Preemption and the Right of Publicity*, 36 U.C. DAVIS

L. REV. 199 (2002) (arguing that conflict preemption should preclude a right

of publicity claim when the publicity right holder consented to the original

work and the use does not infringe copyright).[15]

By playing in football games with the certain knowledge that they

were being filmed by NFL Films, Appellants consented to the creation of

copyrighted works—films of football games—embodying their

contributions. *Dryer*, 2014 WL 5106738 at *15-16; *see Baltimore Orioles,

Inc. v. Major League Baseball Players Association*, 805 F.2d 663, 675–76 &

n.22 (7th Cir. 1986) (finding preemption in similar circumstances). Their

consent need not be valid for purposes of applying state publicity law,

because the issue is whether there was consent for *federal copyright

purposes*: consent to appear in the copyrighted video in which their

appearances were fixed. Appellants' appearances fall outside of the realm of

unfixed performances, and thus of unpreempted common-law copyright—

regardless of whether Appellants count as "authors" for purposes of

---

[15] *See also* Thomas F. Cotter & Irina Y. Dmitrieva, *Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis*, 33 COLUM. J.L. & ARTS 165 (2010) (arguing for conflict preemption of right of publicity claims in cases involving noncommercial speech, absent specific exceptions).

18

copyright's authorship requirement. *Cf. National Basketball Assoc. v.*
*Motorola, Inc.,* 105 F.3d 841, 849 (2d Cir. 1997*)* (noting that "Congress
specifically had sporting events in mind" when it drafted the fixation
provision and finding that fixation merged the performance with the fixed
work for preemption purposes).[16]

Conflict preemption also explains and harmonizes most of the results
in the case law. For example, the Ninth Circuit has recognized that
preemption analysis ought to differ between uses to advertise something else
and use of a work itself. *See Laws v. Sony Music Entm't*, 448 F.3d 1134,
1141 (9th Cir. 2006); *see also* 1 MELVILLE B. NIMMER & DAVID NIMMER,
NIMMER ON COPYRIGHT § 1.01[B][3][b][iv][l] (rev. ed. 2013) (surveying
relevant case law and finding a general divide between uses that are simply
exploitations of the copyrighted work and uses of the copyrighted work to
sell some other product). Unlike in other voice imitation cases finding no
preemption, the plaintiff in *Laws* had consented to the fixation of her voice
in the recording used by defendants.[17] The owner of the copyright in the

---

[16] Appellants could limit the scope of their consent by contract, and contract
claims would not be preempted, but Appellants do not here bring contract
claims.

[17] The use the *Laws* plaintiff sued over also involved the use of her name, *id.*
at 1143. *Laws* allowed the use of the performer's name to accurately identify
her where copyright preemption prevented a claim based on her performance
itself.

Appellate Case: 14-3428     Page: 25     Date Filed: 03/17/2015 Entry ID: 4255390

sound recording could reasonably expect that the performer wouldn't interfere with the copyright owner's exercise of rights, absent some contractual reservation, and thus her claim was preempted. The Ninth Circuit also found preemption when a movie actor alleged that his name and likeness appeared in counterfeit films, because "the essence of [the actor]'s claim is that the . . . defendants reproduced and distributed the [films] without authorization," not that the original copyrighted film had been made without the actor's knowing participation. *Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146, 1155 (9th Cir. 2010).

Likewise, a California court found right of publicity claims by performers in a film preempted when their complaint was that the film was released without their consent (because they hadn't been paid). *Fleet v. CBS, Inc.*, 58 Cal. Rptr. 2d 645, 651 (Cal. Ct. App. 1996); *see also Maloney v. T3Media, Inc.*, No. 14-cv-05048 (C.D. Cal. Mar. 6, 2015), slip op. at 9 ("Accepting Plaintiffs' interpretation [that the right of publicity extended to sale and distribution of photos of athletes] without separating the likeness from the work would impermissibly negate Copyright's intended preemptive effect. Further, it would destroy copyright holders' ability to exercise their exclusive rights under the Copyright Act, effectively giving the subject of every photograph veto power over the artist's rights under the Copyright Act

20

and destroying the exclusivity of rights the Copyright Act aims to protect.");

*Milo & Gabby, LLC v. Amazon.com, Inc.*, No. C13-1932, 2014 WL 1411849

(W.D. Wash. 2014) (finding § 301 preemption of right of publicity claim

based on reproduction of photos showing plaintiffs' children); *Ray v. ESPN,*

*Inc.*, No. 13-1179-CV, 2014 WL 2766187, at *5 (W.D. Mo. Apr. 8, 2014)

(finding preemption where defendant "air[ed] video recordings depicting

[plaintiff] in a 'work of authorship,' which is plainly encompassed by

copyright law").

Professor McCarthy has also advocated using § 301 preemption to

make an advertising/nonadvertising distinction. 2 MCCARTHY, RIGHTS OF

PUBLICITY AND PRIVACY § 11:55, at 817 (2d ed. 2014) (suggesting that

preemption is appropriate when a defendant "reproduces a recorded

performance in an expressive, non-advertising medium").[18] The Third

---

[18] Courts rejecting § 301 preemption reason that regulation of the celebrity
identity captured in an image is not the same as regulation of the copyright-
protected image itself. However, the fact that a persona is not copyrightable
does not end the inquiry even under § 301. Congress intended to preclude
states from giving copyright-like protection to matter within the general
scope of copyright even if that matter was not copyrightable. *See, e.g.,*
*Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011)
(en banc) ("[T]he scope of the subject matter of copyright law is broader
than the protection it affords.... For preemption purposes, ideas and concepts
that are fixed in a tangible medium fall within the scope of copyright . . .
despite the exclusion of fixed ideas from the scope of actual federal
copyright protection."); *Motorola*, 105 F.3d 841 at 849 (state protection for
uncopyrightable facts such as basketball scores was preempted); *Toney v.*

21

Appellate Case: 14-3428     Page: 27     Date Filed: 03/17/2015 Entry ID: 4255390

Circuit also endorsed a commercial advertising/ordinary exploitation distinction. *Facenda,* 542 F.3d at 1029 ("The rationale is that state law has a role in regulating practices of trade, including advertising. But limiting the way that material can be used in expressive works extends beyond the purview of state law and into the domain of copyright law.").

The key issue is that allowing performers to control ordinary, non-advertising exploitation of a copyright would interfere too much with copyright owners' rights, and allowing them to control commercial endorsements does not. To put it another way, the right of publicity's core function is to control uses in commercial advertising for separate products; copyright's core function is not. This is conflict preemption.[19]

At a minimum, to the extent that the "subject matter" and "extra element" inquiries of § 301 are ambiguous, conflict preemption

---

*L'Oreal USA, Inc.*, 406 F.3d 905, 910-11 (7th Cir. 2005) ("[S]tate laws that intrude on the domain of copyright are preempted even if the particular expression is neither copyrighted nor copyrightable.").

[19] *Cf. Laws*, 448 F.3d at 1145 ("We sense that, left to creative legal arguments, the developing right of publicity could easily supplant the copyright scheme. This, Congress has expressly precluded in § 301. Were we to conclude that [plaintiff's] voice misappropriation claim was not preempted by the Copyright Act, then virtually every use of a copyrighted sound recording would infringe upon the original performer's right of publicity . . . . It is hard to imagine how a copyright would remain meaningful if its licensees were potentially subject to suit from any performer anytime the copyrighted material was used.").

Appellate Case: 14-3428     Page: 28     Date Filed: 03/17/2015 Entry ID: 4255390

considerations favor reading them to preempt right of publicity claims against nonadvertising uses of copyrighted works.

## IV.  *Rogers* **Properly Bars Appellants' Lanham Act Claims.**

Courts in the Lanham Act context have confronted a very similar conflict between the First Amendment and false endorsement claims by people portrayed in expressive works. And consensus has been building around a strongly speech-protective standard for nonadvertising speech. Under this approach, most prominently associated with *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), use of a mark in an expressive work is insulated from liability unless the use has "no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [use] explicitly misleads as to the source or the content of the work." *Id*. at 999.[20] Some differences in application of the *Rogers* test persist, but most courts confronting cases involving expressive works in recent years have accepted the basic approach.[21]

---

[20] While *Rogers* itself involved use of a mark (a celebrity's name) in the title of a work, more recent cases have made clear that the same test applies to use within the work itself. *See, e.g.*, *Brown v. Electronic Arts*, 724 F.3d 1235 (9th Cir. 2013); *University of Alabama Board of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1278-79 (11th Cir. 2012); *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003).

[21] *See, e.g., Moore v. Weinstein Co.*, 545 Fed.Appx. 405 (6th Cir. 2013)

Appellate Case: 14-3428     Page: 29     Date Filed: 03/17/2015 Entry ID: 4255390

The *Rogers* test appropriately tracks the two First Amendment considerations relevant in right of publicity cases: the focus on artistic relevance asks whether the use is related to noncommercial speech, or is merely a disguised advertisement for an unrelated product. And the question of whether the use is explicitly misleading relates to falsity; the explicitness requirement provides insurance against potentially speech-suppressive mistakes.[22] Use of *Rogers* in the Lanham Act context therefore aligns with the approach to right of publicity cases we have outlined above, which, outside the common-law copyright situation of *Zacchini*, asks explicitly whether the speech is noncommercial and whether it is false or defamatory.

This alignment is important because it makes little sense to apply

_____

(applying *Rogers* to state-law trademark claims based on use of nickname and life story in film); *Parks v. LaFace Records*, 329 F.3d 437, 461 (6th Cir. 2003) (adopting *Rogers* in the context of song titles); *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 174-75 (S.D.N.Y. 2012) (finding defendant's depiction of a character in the film *The Hangover II* carrying a knockoff Louis Vuitton bag and mispronouncing the brand name protected under *Rogers*); *Winchester Mystery House, LLC v. Global Asylum*, 148 Cal. Rptr. 3d 412 (Ct. App. 2012) (adopting *Rogers* for analyzing uses of landmark as portrayed in film); *Montgomery v. Montgomery*, 60 S.W.3d 524 (Ky. 2001) (adopting *Rogers* for use of image, voice, and name of musician in music video about him). *See also* Daniel Jacob Wright, *Explicitly Explicit: The* Rogers *Test and the Ninth Circuit*, 21 J. INTELL. PROP. L. 193, 203 (2013) (noting widespread adoption of *Rogers*).
[22] Of particular note, unless an expressive work explicitly claims to be "the authorized story," it is unlikely to be material to audiences whether a person portrayed therein consented to be portrayed. The usual consumer protection rationale for Lanham Act protection is therefore minimized with expressive works. *See Silverman v. CBS Inc.*, 870 F.2d 40, 48-49 (1989).

Appellate Case: 14-3428    Page: 30    Date Filed: 03/17/2015 Entry ID: 4255390

different tests to Lanham Act and right of publicity claims.[23] Plaintiffs commonly assert both claims on the same facts, as the plaintiffs did here. Indeed, *Rogers* involved both Lanham Act and right of publicity claims, and the Second Circuit framed the inquiry regarding the right of publicity in nearly identical terms, immunizing "use of a celebrity's name in a movie title unless the title was 'wholly unrelated' to the movie or was 'simply a disguised commercial advertisement for the sale of goods or services.'" *Rogers*, 875 F.2d at 1004.[24]

Using the same approach to resolve the First Amendment conflict in both contexts promotes uniformity and avoids the obvious incentive to avoid constitutional limits merely by repleading.

## CONCLUSION

For these reasons, the judgment of the District Court should be affirmed.

---

[23] *Compare Brown*, 724 F.3d at 1242-47 (finding video game protected by First Amendment against false endorsement claim based solely on use of plaintiffs' image and biographical data) *with Keller v. Elec. Arts (In re NCAA Student–Athlete Name & Likeness Licensing Litig.)*, 724 F.3d 1268 (9th Cir. 2013) (finding video game unprotected by First Amendment against right of publicity claim based on same conduct).

[24] The Second Circuit applied this limit as a matter of Oregon law, as it expected New York would apply that law. *See Rogers*, 875 F.2d at 1004. For reasons previously explained, we believe the First Amendment requires such limitations whether or not state law imposes them.

25

Dated: March 17, 2015          Respectfully submitted,

                              /s/ Rebecca Tushnet
                              Georgetown University Law Center
                              600 New Jersey Ave. NW
                              Washington, DC 20001

                              *Attorney for Amici Law Professors*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because the brief contains 6,048 words, including headings, footnotes, and quotations.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 using 14-point Times New Roman.

3. The brief has been scanned for viruses and it is virus free.

Dated: March 17, 2015       Respectfully submitted,

/s/ Rebecca Tushnet
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, DC 20001

*Attorney for Amici Law Professors*

Appellate Case: 14-3428    Page: 33    Date Filed: 03/17/2015 Entry ID: 4255390

# CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of March, 2015, I electronically filed this Brief of Amici with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 17, 2015          Respectfully submitted,

/s/ Rebecca Tushnet
Georgetown University Law Center
600 New Jersey Ave. NW
Washington, DC 20001

*Attorney for Amici Law Professors*

Appellate Case: 14-3428     Page: 34     Date Filed: 03/17/2015 Entry ID: 4255390